SO ORDERED.

Dated: May 13, 2014

Eddward P. Ballinger Jr., Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

MINUTE ENTRY/ORDER

FOR MATTER TAKEN UNDER ADVISEMENT

| | |
|---|---|
| Bankruptcy Judge: | Eddward P. Ballinger, Jr. |
| Case Name: | Howard Fletcher Thruston |
| Case Number: | 2:10-bk-27593-EPB |
| Adversary Name: | David M. Reaves v. Howard Fletcher Thruston |
| Case Number: | 2:10-ap-02156-EPB |
| Subject of Matter: | Dischargeability under 11 U.S.C. §§ 727(a)(2) and (a)(4) |
| Date Matter Taken Under Advisement: | April 7, 2014 |
| Date Matter Ruled Upon: | May 13, 2014 |

The question presented by this adversary is whether Debtor should be denied a discharge under 11 U.S.C. section 727(a)(2) or (a)(4). After a two-day trial, the parties submitted post-trial briefs and the matter was taken under advisement. Having considered all the evidence and testimony, the Court finds that Debtor knowingly and fraudulently made a false oath or account,

1

or withheld from an officer of the estate recorded information relating to the Debtor's property and financial affairs. Therefore, he is not entitled to a discharge.

## FACTS

The following is undisputed. Debtor Howard Fletcher Thruston filed for Chapter 7 relief on August 30, 2010. Debtor is married to Morgan Thruston ("Mrs. Thruston") who did not join in her husband's bankruptcy. After requesting and receiving three extensions, Debtor filed his initial schedules and statements on October 19, 2010. Debtor listed real property assets of "$1,150,000.?" and current income of $339.50 in his summary of schedules. He did not identify any real property, however, in his schedules. The remainder of the summary of schedules was left blank. Debtor also left blank schedules A, C, D, E, F, G, and H. Schedule B listed two items of personal property: Cash on hand in his Chase checking account of $50 and his contractors and real estate licenses with no listed value. Everything else was noted as "none." Schedule I listed monthly income of $339.50 and Schedule J listed monthly expenses of $2,869.53. Debtor signed, under penalty of perjury, with a notation on the signature line "[i]ncomplete – need help."

Debtor's statement of financial affairs was similarly bare, but for the following five disclosures:

1. Income of $2,037 for two real estate commissions from Dynasty Homes;

2. A $1,200 gift from the Church of Jesus Christ of Latter Day Saints;

3. A transfer of 179 acres in Iowa to "Hammes" for $400,000 on July 24, 2009;

4. An ownership interest in Dynasty Homes, Inc., a real estate/general contracting business; and,

5. An attached list of twelve court proceedings to which he was party within a year of

filing bankruptcy.

The list of twelve court proceedings referenced various forcible detainer judgments; several deficiency actions; an apparent judgment for HOA fees; several proceedings involving credit cards; and a few foreclosure proceedings, some of which, upon closer review, involved properties at issue here. None of the properties, assets or debts, however, were specifically identified or itemized anywhere in Debtor's schedules.

By court order, Debtor filed amended schedules and statements on January 31, 2011. In the amended summary of schedules, Debtor removed the earlier $1,500,000 in real property assets and added personal property assets of $35,200 and liabilities to unsecured, non-priority creditors of $4,520,800. Again, schedules A, C, D, and E were left blank. Debtor did add a few nominal items to schedule B, such as clothing, a firearm, furniture, his "$0" interest in Dynasty Homes, Inc., approximately $30,000 in Dynasty Homes' machinery, and his interest in "lawsuits" of "unknown" value. To schedule F he attached a spread sheet listing just over 100 creditors. In schedule G he listed four unexpired leases: "BMT Leasing, BMT Leasing, Vanguard Leasing, and ? Leasing." No descriptions or other identifying details of the leases were provided. Debtor made minor changes to his statement of financial affairs by reducing the gift from the Church of Jesus Christ of Latter Day Saints from $1,200 to "$400.00?" and removing any reference to the transfer of the Iowa property to the "Hammes" for $400,000.[1]

Subsequently, the Chapter 7 Trustee, David M. Reaves ("Trustee"), filed this adversary proceeding objecting to Debtor's discharge pursuant to 11 U.S.C. sections 727(a)(2), (a)(3) and

---

[1] In his first statement of financial affairs, Debtor also listed himself as the president of Dynasty Homes with a "?" in response to the "nature and percentage of stock ownership." He also listed his wife with a "?" as to her title and left blank the "nature and percentage of stock ownership" held by her. In the amended version, he suddenly listed himself as president owning 100% of the stock and his wife as vice president owning 0% of the stock.

3

(a)(4). According to the Trustee, Debtor failed to disclose the following property interests in his schedules:

1. Real property located at 1683 Highway I, Fairfield, Iowa ("the Iowa Property");

2. Real property located at 1550 N. 40th Street, Mesa, Arizona ("the Citrus Manor Property," also referred to by the parties as "the El Portillo Property");

3. Real property located at 3911 E. Northridge Circle, Mesa, Arizona ("the Northridge Property," also referred to by the parties as "the Rosewood Property");

4. Real property located at Lot 120, Wagon Wheel Park, Navajo County, Arizona ("the Wagon Wheel Property");

5. An ownership interest in Rosemont, LLC;

6. Two automobiles - a 2008 Hummer and a 2007 GMC; and,

7. Various personal bank accounts.

The Trustee moved for summary judgment on all counts and, after oral argument, the Court issued an under-advisement decision granting the Trustee summary judgment. The Court entered a final judgment on May 23, 2012, from which Debtor appealed. The Ninth Circuit Bankruptcy Appellate Panel ultimately vacated and remanded the matter, concluding that a genuine issue of material fact existed as to whether Debtor acted with the requisite intent necessary under sections 727(a)(2) and (a)(4) to deny him a discharge.

## **11 U.S.C. SECTION 727(a)(2) and (a)(4)**

Section 727(a)(2) of the United States Bankruptcy Code denies a debtor a discharge where "debtor, with intent to hinder, delay, or defraud a creditor or any officer of the estate . . . has transferred, removed, destroyed, mutilated or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor or the estate." Section 727(a)(4) of the Code denies debtor a discharge if debtor "knowingly and fraudulently, in
4

connection with the case, made a false oath or account . . . or withheld from an officer of the estate . . . any recorded information, including the books, documents, records, and papers, relating to the debtor's property or financial affairs."

## ISSUES

1. Whether Debtor concealed property of his estate or withheld information regarding Debtor's property or financial affairs.

2. If so, whether Debtor did so with the intent to hinder, delay, or defraud a creditor or officer of the estate or did so knowingly and fraudulently.

## DISCUSSION

A. Property of the Estate

The Bankruptcy Appellate Panel concluded "[t]here is no serious dispute that the Debtor failed to schedule or disclose the assets identified by the Trustee." *In re Howard Fletcher Thruston,* BAP No. AZ-12-1297 (9th Cir. BAP July 9, 2013). The question remains, however, whether Debtor had a legal or equitable interest in those assets such that he was *required* to disclose them. Debtor argues he did not, because all of these assets were owned by his wife as her sole and separate property. Further, even if he had a duty to disclose, there was no value in these assets to the estate: no harm, no foul. The Court disagrees.

Section 541 of the Bankruptcy Code provides that an estate consists of "all legal or equitable interests of the debtor in the property of the debtor as of the commencement of the case," including "[a]ll interests of the debtor and the debtor's spouse in community property as of the commencement of the case that is – (A) under the sole, equal or joint management and control of the debtor; or (B) liable for an allowable claim against the debtor, or . . . against the

5

Case 2:10-ap-02156-EPB    Doc 106    Filed 05/13/14    Entered 05/14/14 06:55:10    Desc
Main Document    Page 5 of 15

debtor's spouse." Section 521(a) requires a debtor to file, *inter alia*, a list of creditors, a schedule of assets and liabilities, and a statement of financial affairs and to include in those documents any community property.

Local Rule 1007 expressly provides that debtors will prepare these schedules and statements using the Official Forms. Official Form 6 is straightforward. For example, the instructions to schedule A – Real Property requires a debtor to "list all property in which the debtor has any legal, equitable, or future interest, including all property owned as a co-tenant, community property, or in which the debtor has a life estate." Further, "[i]f the debtor is married, state whether the husband, wife, both, or the marital community owns the property by placing an 'H,' 'W,' 'J,' or 'C' in the column labeled 'Husband, Wife, Joint, or Community.'" The same is required by schedule B – Personal Property.

Under Arizona law, all property acquired during marriage is presumed community property, with limited exceptions inapplicable here. Arizona Revised Statute ("A.R.S.") section 25-211; *see also Bender v. Bender,* 123 Ariz. 90, 92-93, 597 P.2d 993, 995-96 (App. 1979). "This presumption applies irrespective of which spouse holds legal title." *Sommerfield v. Sommerfield*, 121 Ariz. 575, 577, 592 P.2d 771, 773 (1979). This presumption may be rebutted by clear and convincing evidence. *Bender,* 123 Ariz. at 93, 597 P.2d at 996; *Hatcher v. Hatcher*, 188 Ariz. 154, 159, 933 P.2d 1222, 1227 (App. 1996).

> In this respect it differs from most legal presumptions that are dispelled immediately upon the production of any evidence negating the presumption. The court must be satisfied that the property really is separate before it can state that the presumption has been dispelled. As long as there is any doubt, the property acquired during coverture must be presumed to be community property.

*Porter v. Porter*, 67 Ariz. 273, 279, 195 P.2d 132, 136 (1948).  Therefore, even though Mrs. Thruston holds title to much of the property as her sole and separate property, the law presumes the property is still community property absent clear and convincing evidence to the contrary.[2]

As a matter of law, Arizona courts have concluded that an enforceable disclaimer deed is the clear and convincing evidence necessary to rebut the community property presumption. *Bell-Kilbourn v. Bell-Kilbourn,* 216 Ariz. 521, 524, 169 P.3d 111, 114 (App. 2007); *Bender.* 123 Ariz. at 93, 597 P.2d at 996.  For this reason, the Court finds that the Citrus Manor and Wagon Wheel Properties were Mrs. Thruston's separate property.  Debtor executed disclaimer deeds contemporaneously with Mrs. Thruston taking sole and separate title, renouncing any interest in these properties.  The disclaimer deed constitutes a valid and binding contract, absent allegations of fraud or mistake.  *Bell-Kilbourn*, 216 Ariz. at 523-24, 169 P.3d at 113-14; *Bender*, 123 Ariz. at 92-93, 597 P.2d at 996-97.  The disclaimer deed evidences that Debtor never had an interest in these two properties.[3]  *See Bend*er, 123 Ariz. at 94, 597 P.2d at 997; *see also Bell-Kilbourn*, 216 Ariz. at 524, 169 P.3d at 114.

The Northridge (Rosewood) Property is somewhat different.  The record shows that in 2001, while married to Debtor, Mrs. Thruston took title to the property as her sole and separate property.  As mentioned above, despite taking title as such, the presumption under the law is that it was community property absent clear and convincing evidence otherwise.  *See Bender.* 123 Ariz. at 93, 597 P.2d at 996; *Hatcher v. Hatcher*, 188 Ariz. at 159, 933 P.2d at 1277.  No

---

[2] Debtor admits these assets were acquired while he and Mrs. Thruston were married.
[3] The evidence produced at trial established that the couples' intent in titling the property as Mrs. Thurston's sole and separate property was simply an attempt to maintain one spouse with good credit, which arguably was in furtherance of the community's interests.  This is of no consequence under Arizona law.  In *Bell-Kilbourn*, the parties indisputably agreed to have the husband sign the disclaimer deed in order to ameliorate the financing terms of the purchase.  "Apart from fraud or mistake, the reason behind Husband's signature to the deed does not alter the deed's legal operation and the deed's significance of showing that Husband never had an interest in either property." *Bell-Kilbourn,* 216 Ariz. at 524, ¶ 10, 169 P.3d at 114.

7

argument or evidence was presented that Debtor executed a disclaimer deed renouncing any interest in this property. Instead, the parties executed a series of quit-claim deeds. In 2002, Mrs. Thruston quit claimed the property to her and her husband as community property.[4] In 2007, Debtor executed a quit-claim deed to Mrs. Thruston attempting to return the property to her as her sole and separate property.

Unlike a disclaimer deed, which announces that one has never had an interest in the subject property and establishes the property's separate character, a quit-claim deed acts to make a presumed gift to another. *Bender,* 123 Ariz. at 94, 597 P.2d at 997. "The use of a disclaimer deed is quite different from the situation in which a quit-claim deed is utilized. In the quit-claim deed situation there is no denial of interest made, but solely the relinquishment (or gift) of any possible interest one has in certain property." *Id.* A spouse may establish an intent to change the status of community property to sole and separate property, but such requires a conveyance to the other spouse coupled with "contemporaneous conduct" indicating an intention to grant the property to the other spouse. *In re Sims' Estate*, 13 Ariz. App. 215, 217, 475 P.2d 505, 507 (1970).

In this respect, the intent of the parties is relevant and appropriate. For example, in *Armer v. Armer*, the Arizona Supreme Court refused to find a quit-claim deed executed by the wife to the husband for tax purposes to effectuate a transmutation of the property from community to sole and separate: "Lillian's quit claim deed of the parcel cannot be reasonably considered a gift of her interest. Without a clear intention on the part of Lillian to alienate her interest, the original character of the property, presumed to be community, would remain unchanged." 105 Ariz. 284, 288, 463 P.2d 818, 822 (1970); *see also Dawson v. McNaney*, 71 Ariz. 79, 85, 223 P.2d 907, 911 (1950)(holding deed of trust transferring spouse's community

---

[4] This was seemingly unnecessary, as Arizona law presumed the property was already community property.

8

interest to other spouse for purpose of obtaining tax exemption was not intent to "sale or gift" property).

While initially Mrs. Thruston could not remember why she and her husband executed these quit-claim deeds, she eventually indicated it was to obtain bank financing.[5] While much of Mrs. Thruston's testimony was inconsistent and unhelpful, she did consistently say that the reason why she and her husband held title as sole and separate was to ensure that one spouse always had good credit. For example, if one spouse for some reason lost properties to default and foreclosure, the other spouse's credit would still be good so they could continue to buy investment properties or a home in which their family could live. While the Court does not question the wisdom of this practice, it is clear the parties did things this way on behalf of the community and to benefit the community. The evidence established that the parties rather routinely transferred properties between themselves as their needs required and to benefit their entire "family." The quit-claim deed, moreover, from Debtor to Mrs. Thruston, does not explicitly state that it is being transferred to her as her sole and separate property. In this light, the Court is inclined to find the Northridge Property was at all times community property.

Even if it were Mrs. Thruston's sole and separate property, the remaining assets of which the Trustee complains were community property and should also have been disclosed in Debtor's schedules and statements.[6] Other than the 2008 Hummer and 2007 GMC being titled in Mrs. Thruston's name, nothing else evidenced intent to overcome the community property presumption. Further, the Trustee testified that Debtor provided a copy of his bank statement

---

[5] While not dispositive, Mrs. Thruston consistently spoke in terms of "we" conveyed the property and "we" purchased the property, further lending support to the Court's conclusion that the parties made these transfers solely to further their community's financial interests. The parties also considered this their home and, more than anything else, attempted to title the property as Mrs. Thruston's sole and separate property to protect the community and Debtor's credit if there was any default.

[6] This is not a case where the sole issue is the nondisclosure of any one piece of property. The evidence shows numerous nondisclosures, all of which collectively paint an inaccurate picture of the Debtor's finances and conduct.

9

early on in the case indicating he was making the payments to the lienholders GMAC and Ford Credit. Debtor did not dispute this.

With respect to Rosemont, LLC, the evidence established that Mrs. Thruston became the sole member on February 8, 2007, when the prior members, Stephen and Carol Trice, resigned. According to Mrs. Thruston and Debtor, Rosemont, LLC, owned a commercial property referred to as Rosemont Business Park, II, 1909 N. Rosemont, Mesa, Arizona. Debtor and Mrs. Thruston admitted that at the time Debtor filed his bankruptcy, Mrs. Thruston still owned Rosemont, LLC. It was not until December 6, 2010, that she removed herself as the sole member and transferred the property back to Stephen Trice as the sole member.[7] None of this information was disclosed in Debtor's bankruptcy and no evidence was presented indicating this was not a community asset.[8]

The Trustee also complained that Debtor did not properly list all of his bank accounts and balances in his schedules. A copy of Debtor's Chase Bank statement indicates that at the time he filed for bankruptcy protection, this account held approximately $4,224.51, not the $50 listed on the schedules. Debtor's schedules do not include any other bank accounts, yet the Trustee testified that at Debtor's 341 hearing additional bank statements were disclosed, including those

---

[7] That same day, Rosemont, LLC, itself filed for bankruptcy protection through Stephen Trice (2:10-bk-38993-GBN).

[8] In fact, Mrs. Thruston's testimony regarding her ownership of Rosemont, LLC, lacked credibility. Her story was at best incomplete and contradictory. She could not remember some very basics, such as what, if anything, she paid for Rosemont, LLC; whether her husband's business, Dynasty Homes, Inc., leased space at the Rosemont building; what the monthly income or expenses were for the building; what the nearly $1.3 million in loans she placed on Rosemont, LLC, were for; why she transferred the property back to Mr. Trice; whether she received any consideration when transferring the property back to Mr. Trice; whether she informed him of all the liens she had placed on the property; or whether she knew Rosemont, LLC, was going to file bankruptcy upon re-transfer. Her failure to remember these details was despite her admission that she paid all the bills and managed the property. She could remember no details regarding the $1 million loan she took on the property. And, while she acknowledged that she had significantly encumbered the property at the time she transferred it back to Mr. Trice, she had no explanation as to why Mr. Trice would want to accept title to a property with substantial negative equity. Her best explanation was simply that she thought he could possibly refinance it better than she. Her explanation was illogical. Debtor himself testified that he was, in fact, responsible for organizing the transfer from Mr. Trice to his wife. The clear implication is that Mrs. Thruston simply held title for convenience sake. The person in control of the property, taking out loans on the property and transferring the property was Debtor.

10

for Debtor's business, Dynasty Homes. Debtor offered no explanation for these missing accounts, other than to say there was essentially nothing in them.

Based on the foregoing, the Court finds at minimum that the Iowa Property, 2008 Hummer, 2007 GMC, Rosemont, LLC, and Debtor's bank accounts should have been disclosed in his schedules and statements. The Court rejects Debtor's no harm, no foul argument.

> A debtor has an uncompromising duty to disclose whatever ownership interest he holds in property. It is the debtor's role to simply consider the question carefully and answer it completely and accurately. (Citation omitted.) Even if the debtor thinks the assets are worthless he must nonetheless make full disclosure. (Citation omitted.) In completing the schedules it is not for the debtor to pick and choose [sic] which questions to answer and which not to. Indeed, the debtor has no discretion—the schedules are to be complete, thorough and accurate in order that creditors may judge for themselves the nature of the debtor's estate. (Citation omitted.)

*In re Coombs,* 193 B.R. 557, 563 (S.D. Cal. 1996)(quoting *In re Lunday*, 100 B.R. 502, 508 (D.N.D. 1989)); *In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir. 1986) (lack of injury to creditors irrelevant); *In re Downey*, 242 B.R. 5, 17 (Idaho 1999)(fact that estate had no entitlement to property because statute of limitations had passed was irrelevant).

B. Intent

The Trustee has sought non-dischargeability under both subsection (a)(2)(A) and (a)(4) of 11 U.S.C. 727. Because the Court denies Debtor his discharge under subsection (a)(4), it need not address (a)(2)(A).

Under section 727(a)(4), the Trustee must establish that Debtor made a false statement under oath in connection with the case, the oath related to a material fact, the oath was made knowingly and the oath was made fraudulently. *In re Retz*, 606 F.3d 1189, 1197 (9th Cir. 2010); *see also In re Searles*, 317 B.R. 368 (9th Cir. BAP 2004), *aff'd*, 212 F. App'x 589 (9th Cir. 2006).

11

A false statement or an omission from debtor's schedules or statement of financial affairs may constitute a false oath. *Id.; see also In re Khalil*, 379 B.R. 163, 172 (9th Cir. BAP 2007), *aff'd* 578 F.3d 1167 (9th Cir. 2009). A false statement is material if "the statement bears a relationship . . . to the debtor's estate, and concerns the discovery of assets . . . or the existence and disposition of the debtor's property." *Khalil,* 379 B.R. at 173; *see also Retz*, 606 F.3d at 1198. The value of the omitted asset or the lack of injury to creditors is not material, but the "false statement must relate materially to the debtor's financial affairs or the bankruptcy process." *Downey,* 242 B.R. at 14. A debtor acts knowingly if he acts "deliberately and consciously." *Retz*, 606 F.3d at 1198. And, last, a debtor's fraudulent intent can be proved by direct and circumstantial evidence, including inferences from the debtor's conduct and all surrounding circumstances. *Id*. A pattern of falsity, or even a single false oath, or statements made with a reckless disregard of its truth suffices. *Id.*; *In re Downey,* 242 B.R. at 13.

> True, a false statement in the bankruptcy schedules or statements of financial affairs caused by mere mistake or inadvertence is not sufficient to require denial of discharge, because the debtor must have fraudulently intended to make the false oath or account. Nevertheless, 'the courts have held that a reckless disregard of both the serious nature of the information sought and the necessary attention to detail and accuracy in answering may give rise to the level of fraudulent intent necessary to bar a discharge.' *Diodati,* supra, 9 B.R. at 808; *Bobroff,* supra, 58 B.R. [at] 953 ('[t]he requisite intent under § 727 may be predicated on evidence of a pattern of reckless and cavalier disregard for the truth'); *Cycle Accounting Services,* supra, 43 B.R. at 273 (reckless indifference to the truth is sufficient to deny discharge).

*In re Syrtveit*, 105 B.R. 596, 598 (D. Mont. 1989) (citing *In re Martin*, 88 B.R. 319, 324 (D. Colo. 1988)).

There is no question that Debtor omitted pertinent information from his schedules and statements. He admitted this at trial. While he attempts to excuse this by saying he noted next to his signature that they were incomplete and that he needed help, that is not a valid excuse.

12

Debtor filed his amended schedules and statement of financial affairs with little improvement. He did not make the same plea then. Further, the omissions clearly are material in that they relate to the existence and disposition of his property. Debtor acknowledges preparing the documents and deliberately and knowingly signing the schedules and statements.

The evidence established that Debtor knew at the time these schedules and statements were false. Debtor's argument that he had a good faith belief that he had no interest in many of the assets flies in the face of his own conduct in this case. For example, US Bank sought stay relief to finalize its foreclosure on the Iowa Property in September 2010. Debtor filed an objection on October 1, 2010, expressly stating, "I have an interest in this property and it has a higher value than all of the outstanding indebtedness owed to Movant." Eighteen days later he filed his schedules and statements omitting this interest. He maintained this position even after the Trustee filed this adversary on December 1, 2010. Debtor testified at trial that at the time he objected to US Bank's motion, he genuinely believed he had an interest in the property. If he genuinely believed he had an interest in the Iowa Property on October 1, 2010, the property should have been listed in his original schedules filed on October 19, 2010.

The same is true with respect to the Citrus Manor and Northridge (Rosewood) Properties. M&I Bank sought stay relief on the Citrus Manor Property on November 1, 2010, and Debtor objected on November 15, 2010, again stating, "I have a right to protect my interest in this property by filing for bankruptcy." Debtor went so far as to argue at the Citrus Manor stay relief hearing on December 28, 2010, that, "[a]s far as the house goes, obviously Arizona is a community property state. I have an interest in the property because of that." He also stated at that hearing that there could be significant equity in the property for benefit of his creditors. ING Bank sought stay relief on the Northridge (Rosewood) Property on February 17, 2011. By this

13

Case 2:10-ap-02156-EPB    Doc 106    Filed 05/13/14    Entered 05/14/14 06:55:10    Desc
Main Document    Page 13 of 15

time, Debtor had filed his amended schedules, yet he still objected to ING's motion on March 15, 2011, arguing that he had a right to protect his interests by filing bankruptcy and that the home was foreclosed upon illegally. Debtor cannot have it both ways.

With respect to the Hummer and GMC Truck, Debtor had no explanation for why they were not listed in his schedules other than he did not drive the vehicles and they were titled in Mrs. Thruston's name. Debtor also admitted failing to disclose all his bank accounts, but again simply argued no harm, no foul because there was no money in them and he eventually turned them over to the Trustee directly. The same was true for Rosemont, LLC.

The Court also rejects Debtor's argument that he relied on advice given to him by an attorney. The attorney's testimony clearly indicated that while he gave Debtor some very general advice about what constitutes property of the estate for purposes of disclosure, he and Debtor did not discuss any particular assets of Debtor and whether they qualified as community or sole and separate. Instead, the conversation was simply that a spouse's sole and separate property is not property of the estate and need not be disclosed.

Good faith errors in completing one's schedules and statements are acceptable and understandable. That is not what occurred here. *See In re Syrtveit*, 105 B.R. 596 (D. Mont. 1989). Debtor's schedules and statements were essentially blank. Debtor did not even list minimal personal property such as clothing, furniture or the like in his first attempt. The amended schedules and statements were little improvement. Debtor's suggestion that he disclosed pieces of information in certain parts of his schedules that could have led the Trustee to make certain assumptions about various assets is also insufficient. Full disclosure and candor is required. This is not meant to be a game of hide and seek.

14

In reviewing this bankruptcy proceeding and listening to the testimony of Debtor and his spouse, the Court is left with the distinct impression that they have engaged in a pattern of delay to put off the inevitable. The Court has granted Debtor extension after extension to file motions, responses, replies, statements and schedules. This case has been pending since 2010. In reviewing the related bankruptcy cases involving Debtor and Mrs. Thruston, the underlying theme has been one of delay and abuse of the process. Mrs. Thruston herself filed three bankruptcies during the pendency of this case, only to have all of them dismissed:

> Chapter 13, 2:11-bk-16315, filed June 6, 2011, and dismissed October 31, 2011, for failure to file schedules and statements, a plan, statement of current monthly income, or declaration regarding payments advices.
> .
> Chapter 13, 2:11-23295, filed August 15, 2011, and dismissed October 31, 2011, for exceeding Chapter 13 debt limits.
>
> Chapter 11, 2:12-01617, filed January 30, 2012, and dismissed March 19, 2012, with prejudice, prohibiting Mrs. Thruston from filing another case without bankruptcy approval before September 19, 2012. This dismissal resulted from the Court's *sua sponte* Order to Show Cause issued against Mrs. Thruston in which the Court expressly stated, "There is reason to believe debtor and her husband are engaged in a calculated practice of filing uncompleted bankruptcy cases to avoid their secured creditors' collection efforts."

Mrs. Thruston's testimony in this adversary proceeding was less than credible. The majority of her answers to questions about the properties she claimed were her sole and separate property were, "I don't know" or "I don't remember."

## **CONCLUSION**

For the foregoing reasons, Debtor is denied his discharge under 11 U.S.C. section 722(a)(4). The Trustee is to lodge a form of order consistent with this decision.

15